BROWN et al. v. CITY OF ITHACA.

(Supreme Court, Appellate Division, Third Department.   December 28, 1911.)

MUNICIPAL CORPORATIONS (§ 834*)—IMPROVEMENT OF STREAMS—LIABILITY.

> Where a city, through a board created by Laws 1906, c. 345, with power to control the flow of water in streams, improved a stream by raising one of its banks to protect its own property, and thereby caused an overflow in consequence in the opposite bank to the injury of an individual, in time of flood not shown to have been extraordinary, the city could not escape liability on the ground that it engaged in the performance of works of a public nature, but it was liable if it failed to exercise due care to protect the individual's property and damages resulted therefrom.

> [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1784; Dec. Dig. § 834.*]

Appeal from Trial Term, Tompkins County.

Action by Cary H. Brown and another against the City of Ithaca. From a judgment of dismissal, and from an order denying a new trial, plaintiffs appeal.   Reversed, and new trial granted.

This is an action for damages claimed to have been sustained by reason of the overflowing of Fall creek in the city of Ithaca upon February 15 and March 3, 1908.   Said stream has its sources to the east of the city and reaches the valley through a deep gorge, flowing thence in a westerly and northwesterly direction until it reaches the level of Cayuga Lake.   North Cayuga street extends north and south, and appellant's premises are situated upon the east side of this street and some 200 feet south of the creek. Cayuga street crosses the creek by a bridge with a span of 104 feet, and about 300 feet to the west the Lehigh Valley Railroad crosses with a bridge of about the same length.   The banks of the creek in the vicinity of Cayuga street were formerly low, and in places not well defined, it appearing that in 1904 the creek had no north bank for some distance east of Cayuga street, and that prior to 1907 there were depressions or flood water channels to the south at the railroad bridge, on both sides of the creek between the railroad bridge and Cayuga street, and to the north along the east side of Cayuga street.   Prior to 1907 the south bank east of Cayuga street was higher than the land opposite, and it does not appear that this part of the south bank had ever been overflowed.   Prior to the floods in question, the channel to the south along the railroad track had been filled, but by whom does not appear.

By chapter 345 of the Laws of 1906, "the board of creeks, drainage and park commissioners of the city of Ithaca" was established, with wide powers for "controlling and regulating the flow of water in the creeks and water courses and for protection against overflow and for providing relief channels or additional water courses   *   *   *   as the board shall deem for the best interests of the city."   It was further provided that nothing in the act should be so construed to authorize any compensation for damages for which the city would not otherwise be responsible.   Pursuant to this act, the board thereby constituted in the fall of 1907 undertook to improve Fall creek by cleaning out the channel and depositing the materials so removed and also ashes upon its banks.   Both banks were thus raised from the railroad bridge east to Cayuga street; but east of Cayuga street the north bank only was raised, the south bank being left unchanged.   In this south bank there had existed prior to 1907 a depression some 200 feet east of Cayuga street, so that after the north bank opposite was raised the south bank was for 20 or 30 feet lower by from 1 to 3 feet than the north bank.   Upon the first date mentioned a flood occurred, with the result that there was an ice jam at the railroad bridge, the stringers of which were a little lower than the banks

as raised. This jam extended back practically all the way to Cayuga street, and the impounded waters were raised until they overflowed the south bank east of Cayuga street at the depression mentioned and caused the damages claimed; the north bank opposite being all the time above the water. At the height of the flood citizens cut the north bank opposite the depression, which soon stopped the flow of water through the south bank. The north bank was within two days thereafter repaired, and a few weeks later and on the second date mentioned a second flood took place under similar circumstances, and appellant's lands were again overflowed. Damages from both floods are claimed by appellants, although the damages were not separated upon the trial. It appears that the lands on both sides of the creek west of Cayuga street were largely unoccupied and unused. On the east side of Cayuga street and north of the creek were lands owned or controlled by the city or by the board of education and used as a public playground.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, SEWELL, and BETTS, JJ.

J. J. McGuire, for appellants.
P. F. McAllister, for respondent.

SMITH, P. J. The respondent invokes the rule that municipal corporations engaged in the performance of works of a public nature authorized by law are not liable for consequential damages occasioned thereby to others, where private property is not directly encroached upon, unless such damages are caused by negligence. Atwater v. Trustees, etc., 124 N. Y. 602, 27 N. E. 385. In the case at bar no negligence has been testified to directly nor proved, except as shown by the acts of raising the banks of this stream. But these acts evidently closed certain overflow or flood water channels which formerly took care of the flood waters of the creek, with the result that waters were diverted from their customary channels and into and through the depression in the south bank and so over appellant's premises. Such a diversion clearly amounts to an invasion of appellant's property rights, and, if claimed to be authorized under the act creating the board, the statute must be deemed unconstitutional in so far as it permits such a taking in effect of private property for a public use without compensation.

No evidence was given as to whether or not this flood was such an extraordinary one that the overflow at the depression into the south bank could not reasonably have been anticipated to result from the raising of the opposite bank. The excessive fall of the stream before reaching the valley and the various overflow channels or depressions along the banks of this stream may be considered as giving notice that the elevation of the banks west of Cayuga street and on the north side of the stream east of Cayuga street might easily cause an overflow at the depression in the south bank in case of an ice blockade at the low railroad bridge. The board had engineering advice at its disposal and was presumably familiar with all the conditions. It was apparently solicitous to protect the public property along the north bank, and this even at the expense of private property, as is shown by the repairing of the cut in the north bank after the first flood had shown the risk of an overflow at the depression in the south bank. Although for a mere error in judgment by the board the city would not be lia-

ble, nevertheless we think that the acts here shown were not so clearly judicial, nor the damages so merely consequential in their nature, as that the case should not have gone to the jury on the question of negligence.

Had the banks of this creek been raised to an equal height, it might then have been claimed that the municipality is protected under the rule of law invoked. The banks of the stream, however, were from one to two feet higher than the outlet under the railroad bridge. In a flood not shown to have been extraordinary the ice jam was followed by the inevitable consequence that the water flowed over the lower embankment upon the south by reason of the blocking of the natural outlet of the stream by the raising of the bank upon the north of the stream. Such inevitable results must be deemed to have been deliberately intended, and the acts causing them, especially in view of the evident intent to protect the city's property upon the north, cannot be deemed to be the exercise of a judicial power around which the law in certain cases throws immunity. In our judgment the jury should have been allowed to say whether this commission exercised due care to protect the plaintiff's property in this construction, and, if not, what damage resulted from its failure to exercise such care.

The judgment and order should therefore be reversed, and a new trial granted, with costs to abide the event.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event. All concur.